# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BERNADETTE BODO and OVIDIU ANDREICA, wife and husband, | ) )  Case No. 17 CV 9254 |
| Plaintiffs, | ) )  Judge Joan B. Gottschall |
| v. | ) ) |
| KEVIN K. McALEENAN,[1] Acting Secretary, Department of Homeland Security, et al., | ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Bernadette Bodo ("Bodo"), who is a United States citizen, married Ovidiu Andreica ("Andreica"), in 2011. Later that year, they simultaneously filed a Form I-130 petition asking the U.S. Citizenship and Immigration Service ("USCIS") to recognize the relationship and a Form I-485 application to adjust Andreica's status to lawful permanent resident. The USCIS found Andreica and Bodo did not enter the marriage in good faith and denied the I-130 petition. Obtaining a final decision took more than six years, until November 21, 2017, and two trips to the Board of Immigration Appeals ("BIA" or "Board"). In this suit Bodo and Andreica seek judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2). They also plead that their due process rights have been violated, and they request a writ of mandamus. The present dispute concerns the administrative record designated by the defendants as "A.R.", *see* ECF No. 22. Bodo and Andreica move to supplement the administrative record and to take limited discovery. They argue that the record is incomplete and that supplementation is

---

[1] Acting Secretary of Homeland Security Kevin K. McAleenan is automatically substituted for the former office holder named as a defendant and sued in his official capacity. Fed. R. Civ. P. 25(d).

warranted by defendant's bad faith conduct. The court grants the motion in part and denies it in part, finding that the record is incomplete, but deposing witnesses interviewed in the underlying investigation is not justified on the present record.

## I. Administrative Proceedings

This case has a long and complicated procedural history. The BIA ultimately upheld a decision of the Director of the U.S. Citizenship and Immigration Services ("USCIS") Chicago Field Office ("Director") concluding that Bodo was living with her ex-husband, Flavius Petrasca ("Petrasca"), and not with Andreica. A.R. 54–55.

### A. **Application, Initial Evidence, and First Denial**

Plaintiffs applied to adjust Andreica's status by filing forms I-130 and I-485, and supporting materials, in or around June 2011. A.R. 332–34. Plaintiffs tell the court that USCIS personnel interviewed them twice in the Chicago Field Office on September 12, 2011, and February 1, 2012. Mot Limited Disc. 3, ECF No. 33. After more than two years of waiting for a decision, plaintiffs filed a pro se petition in this court, No. 13-CV-2600, seeking a writ of mandamus compelling USCIS to decide their applications. *Id.* at 3.

The investigatory steps taken next became the lynchpin of the denials at issue here. There is evidence in the administrative record of an investigatory visit to two residences on or around May 2, 2013. As explained below, the investigative report in the record is dated over four years after the events it describes and after the Director had issued the two decisions at issue here.

Back to the procedural chronology. On May 28, 2013, the Director sent a notice of intent to deny the petitions and gave Bodo and Andreica an opportunity to submit additional evidence. A.R. 312–14. The notice stated that the Director did not believe that Bodo and Andreica's

marriage was bona fide because Bodo was still living with her ex-husband, Petrasca, and her present husband, Andreica, lived at a different address. *Id.* The notice explained that the Director had evidence that Petrasca filed an insurance claim for water damage in the basement of the building in which Bodo and Andreica claimed to live, 1444 N. Washtenaw Avenue in Chicago. A.R. 313. The notice further advised, "On May 2, 2013, USCIS conducted a site visit and interviewed two neighbors of 1444 North Washtenaw. These two neighbors have lived in the neighborhood for over thirty years, and they are familiar with the owners of 1444 North Washtenaw. They have identified you and your husband as 'Alin,' your ex-husband." *Id.*

USCIS officials also visited a building more than 40 blocks away on the same street according to the notice, believing that Andreica in fact lived there, 5616 N. Washtenaw, Chicago, Illinois, Apartment 105. A.R. 313. The notice described this visit as follows:

> It was noted that the mailbox for apartment 105 listed the name "Alin Flavius Petrasca," and, as such, Mr. Petrasca likely still continues to use the 5616 N. Washtenaw address as a mailing address. However, next-door neighbors were interviewed and presented photographs of Flavius Petrasca and Ovidiu Andreica. Both witnesses testified that they had never seen Mr. Petrasca at the property. One of these witnesses stated that Ovidiu Andreica resides in apartment 105.
>
> Regarding the name listed on the mailbox, mentioned above, the manager of 5616 North Washtenaw Apartment 105, Ms. Donna Domes of Acorn Properties, confirmed that she has no knowledge of any person named Alin Flavius Petrasca, and that Mr. Petrasca's name is not authorized to be assigned to the mailbox for unit 105. She informed USCIS that the lease on file for the present tenant in unit 105 is Toma Basaraba.

A.R. 313–14.

Plaintiffs responded to the notice with 31 pieces of additional evidence. Bodo and Andreica averred in affidavits that they lived on the second floor of the building at 1444 N. Washtenaw and that the insurance claim for water damage was limited to the downstairs apartment in which Petrasca and his mother lived. Bodo Aff., A.R. 177; *see also* Andreica Aff.,

3

A.R. 182; Petrasca Aff., A.R. 183. Bodo described her reasons for making this arrangement in some detail, explaining that she and Petrasca mistook a desire to be as close as family for wanting to be married, that they agreed that their relationship had become much like the relationship of a brother and sister, that they divorced amicably, and that the two remained friends. *See* A.R. 177, 180; *see also* Andreica Aff., A.R. 181; Petrasca Aff., A.R. 183–84. Bodo also stated (and nothing in the record contradicts this) that she purchased the multi-family building at 1444 N. Washtenaw in 2006 and was initially friendly with her neighbors. A.R. 178. That changed in or around 2010 after she was robbed by a "so-called friend from the neighborhood." *See* A.R. 178. Bodo and her then-husband stopped associating with the neighbors after that. *See id.*; Petrasca Aff., A.R. 183. This provided a perfectly plausible explanation for Bodo's neighbors still thinking she was married to Petrasca. *See id.*[2]

Bodo's affidavit also responded to what she then knew about the interviews with her neighbors at 1444 N. Washtenaw:

> I did have a chance to speak with my next door neighbors, and the De La Rosa's [sic] (who said they spoke with you). They told me that they were questioned by your officers and did not deny that Ovidiu [Andreica] lives here but only confirmed that Flavius [Petrasca] and his mother do in a separate section. They also said that they told your officer that there were others living here but that they did not know their names. They said they could not make a correct identification from your photo of Ovidiu because "they all look alike" and because they never learned Ovidiu's name. Though Ovidiu says little but "hi" or "bye" to these neighbors, they are aware that he has lived here for the past couple of years and they even know which car he drives as it is parked in front of their house most evenings. These are the neighbors that I was referring to when I said that Flavius and I once spent a couple of summers socializing with neighbors and they knew us as a couple.

Bodo Aff., A.R. 178.

Plaintiffs also submitted at least 12 affidavits of friends and relatives; one was from a foreign exchange student who lived with Bodo and Andreica. *See* A.R. 185–99. Documentary

---

[2] Petrasca avers that he has a girlfriend, and she is not Bodo. Petrasca Aff., A.R. 183

4

evidence was also presented for consideration: jointly filed tax returns; bank and credit card statements; utility and insurance bills; printouts of commonly used real estate websites; and certificates and membership cards issued to Bodo. *See* A.R. 166–289. The affidavits and documents generally corroborated the averments of Bodo, Andreica, and Petrasca concerning the nature of their relationships and living arrangements. *See* A.R. 185–91, 193–99.

To explain his name on the mailbox for the 5616 N. Washtenaw apartment, Petrasca's affidavit averred that he temporarily lived at the apartment from January–September 2012 before he moved back to the apartment beneath Bodo and Andreica. A.R. 183. He got permission to continue receiving mail at the 5616 N. Washtenaw address because he was tired of mail sent to him at 1444 N. Washtenaw being lost or stolen. A.R. 183. Plaintiffs also provided an affidavit from Toma Basaraba, who held the lease to the 5616 N. Washtenaw apartment (Unit 105) in 2012. Notice Intent to Deny 2, A.R. 314; Basaraba Aff., A.R. 192. He confirmed that Petrasca lived in the apartment from January–September 2012. A.R. 192. Basaraba also averred that Andreica has never been in the building or lived in the apartment. *Id.*

The Director denied Bodo's petition on July 9, 2013. A.R. 152–58; *see also* A.R. 159–65 (companion denial of I-485 application). The Director dismissed nearly all of the affidavits in a single sentence as "self-serving." A.R. 153. As for Bodo and Andreica's affidavits, the Director stated that the two floors had not been formally designated as apartments one and two. A.R. 153–55 . The USCIS then pointed to various small differences in the addresses given on the supporting documents. *See* A.R. 154. Bodo and Andreica's tax returns did not, for instance, use a separate apartment number in the address; one bill listed "Fl 12" and was only in Andreica's name; another was only in Bodo's name; and the bank statements use "apartment 1" in the address. *See id*.

5

### B. First Appeal and Remand To Complete the Record With "Documentary Evidence"

Plaintiffs appealed. They submitted additional evidence on appeal, including multiple certified appraisals of the building at 1444 N. Washtenaw showing that the building where Bodo lives is a two-story building.[3] The BIA remanded the matter to the Director some two years later on June 19, 2015. A.R. 92–95. The Board held that the record was incomplete. A.R. 94–95. Up to this point, the only information plaintiffs had about the investigation came from the May 28, 2013, notice of intent to deny. The BIA stated that "the record does not include documentary evidence relating to any site visit or insurance claim, and such evidence must be contained in the record of proceedings." A.R. 94 (citation omitted). The BIA also observed that neither of the Director's decisions mentioned the interviews with Bodo and Petrasca. A.R. 94, n.1. The Board remanded "to ensure that the record is complete," adding that evidence Bodo submitted for the first time on appeal should be considered. *Id.*

Plaintiffs represent that after remand Andreica sat for a third interview in a Chicago field office and that additional documentation was submitted showing that Bodo suffers from a serious medical condition requiring extensive travel abroad. Mot. Limited Disc. 5. Andreica's inability to travel internationally caused Bodo "a great deal of hardship." *Id.* Plaintiffs do not make clear whether this additional evidence is in the administrative record. *See id.*

The Director again denied Bodo's petition on November 21, 2016. A.R. 1–8. The Director again emphasized the inconsistencies in the addresses on bills and bank statements and the lack of designation of the two apartments as "one" and "two;" the decision reiterated the conclusion that most of the affidavits in the record were "self-serving." *See* A.R. 3 (citations

---

[3] Plaintiffs represent that it took the Director more than a year to forward the record on appeal to the BIA. Mot. Limited Disc. 4, ECF No. 33.

omitted). After reviewing the appraisals Bodo submitted on appeal, the Director stated that "it is reasonable for the Service to believe that this building is clearly divided into two units. Furthermore, it appears to show both levels are equipped and furnished to be used and occupied as two separate and secure living spaces." A.R. 3. Finally, the Director pointed to certain perceived inconsistencies between some of the 31 exhibits Bodo submitted in response to the notice of intent to deny, comparing and contrasting the affidavits with the alleged statements of several persons who spoke with investigators on May 2, 2013. *See* A.R. 5–8. The Director also referred for the first time to a purchase order dated March 5, 2011, from a car dealership showing Bodo as the buyer and Andreica as a co-buyer. A.R. 6. The documents showed signs of extensive water damage. *Id.* The Director "expresses concern of the plausibility that the document may have in fact been involved in the flooding incident in the lower level unit" where Petrasca was living. *Id.* The Director did not remark on the fact that Bodo and Andreica were listed as co-purchasers. *See id.*

### C. Second Appeal

Plaintiffs appealed for a second time. They represent without contradiction that the Director took more than eight months to certify the record. Mot Limited Disc. 6–7. Only as part of the process of forwarding the record did the Director produce a report of the investigation conducted on May 2, 2013. *Id.* The certified record included a memorandum to the file from someone[4] in the USCIS Office of Fraud Detection and National Security ("FDNS"). A.R. 54–55. This memorandum, which is very much at issue here, will be referred to as the FDNS memo.

---

[4] The sender's name has been redacted from the copy in the record.

*1. The FDNS Memo*

The FDNS memo is addressed to the file and is dated July 18, 2017. A.R. 54. The memorandum describes the investigatory visits to the two Washtenaw addresses more than four years earlier (May 2, 2013). *See* A.R. 54–55. The statements of two individuals identified as witnesses one and two interviewed at the 1444 N. Washtenaw address at which Bodo and Andreica lived are recounted. *See id.* According to the memo the witnesses identified the owners of 1444 N. Washtenaw using Bodo and her ex-husband's first names. *See* A.R. 54. The witnesses reportedly also said that the two lived alone in the first-floor apartment, though how they knew that is not stated. *See id.* The unnamed witnesses correctly identified a photograph of Bodo. *Id.* They also identified a photo of Petrasca, giving his first name as "Alin." *Id.* After seeing a photo of Andreica, both witnesses did not recognize him as Bodo's husband; one witness added that "Alin" was her husband. *Id.*

Regarding the visit to the second North Washtenaw address, investigators spoke to three people. *See* A.R. 54–55. The first told investigators that he thought two men lived in unit 105, but he did not know their names. A.R. 54. The second person thought three men might live in the unit. A.R. 55. The third person to whom the investigators spoke stated that he lived in unit 105. *Id.* He said that he had lived there for about six months. A.R. 55. None of the three people interviewed could identify a photo of Bodo's ex-husband. A.R. 54, 55. Two of the witnesses identified a photo of Andreica as a person they had seen in the building; one (but not the unit 105 resident) thought that he lived in unit 105. *Id.* The report states that the occupant of unit 105 "hesitated . . . and after a while stated that he didn't know [Andreica]." A.R. 55. It is unclear whether the hesitation indicated uncertainty to the investigator, as with a person carefully searching his memory. *See id.*

*2. Disposition of Appeal*

The BIA affirmed the Director's decision on November 22, 2017. A.R. 9–12. The Board held that the FDNS memo undermined plaintiffs' contention that their marriage was bona fide. A.R. 11. It characterized as "significant" the memo's description of the witness statements and responses to being shown photos of Andreica and Petrasca. *Id.* Plaintiffs' arguments that the report was not reliable and not supported by corroborating evidence were rejected based on a "presumption of regularity" that attaches to public officials' performance of their official duties. A.R. 11–12 (citing *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)). The record before the BIA included no interview notes, but the BIA stated that the plaintiffs had not explained how their absence prejudiced them. *See id.* Finally, the Board found the evidence Bodo submitted insufficient to rebut the FDNS memo:

> We acknowledge the voluminous documentary evidence submitted in support of the visa petition, but we agree with the Director that these documents are not persuasive evidence of a shared life together sufficient to overcome the doubts raised by the derogatory information raised in the investigative report.

A.R. 12.

**II. Analysis**

The APA authorizes a reviewing court to set aside agency action found to be, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court must "review the whole record or those parts of it cited by a party . . . ." 5 U.S.C. § 706. Review therefore focuses on "the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), as contrasted with a newly created record in the reviewing court. *USA Group Loan Services, Inc. v. Riley*, 82 F.3d 708, 715 (7th Cir. 1996).

9

Discovery is therefore rarely appropriate in APA suits such as this one. *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1081 (7th Cir. 2016) (citing *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009)) (discovery "generally" inappropriate); *Riley*, 82 F.3d at 715 (discovery "rarely" appropriate). Discovery may be proper, however, if the plaintiff "can make a significant showing that it will find material in the agency's possession indicative of bad faith or an incomplete record." *Foxx*, 815 F.3d at 1082 (quoting *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487–88 (D.C. Cir. 2011)). Supplementation or Discovery may also be necessary if the agency's "failure to explain [the challenged] action effectively frustrates judicial review" or "when it appears the agency has relied on documents or materials not included in the record." *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988) (internal quotations and citations omitted) (adopted in *Riley*, 82 F.3d at 715).

Bodo and Andreica maintain that the administrative record designated by defendants is manifestly incomplete because it lacks notes, photographs, and other materials created or used in connection to the May 2, 2013, site visits. Mot Limited Disc. 2. Further they contend that the timeline of agency actions here–particularly the introduction of the FDNS memo dated more than four years after the events it describes—indicates bad faith. *See id.* at 13–15.

**A. Incompleteness**

The most powerful, but by no means the only, evidence of incompleteness is the FDNS memo itself. The date on the memo's face reads "July 18, 2017," and it describes the events of an investigation conducted on May 2, 2013. *See* A.R. 54–55. The notice of intent to deny and the two decisions of the Director both predated the FDNS memo; respectively, the notice is dated May 28, 2013; the Director's first decision is dated July 9, 2013; and the second decision is dated

November 21, 2016. The BIA's first order confirms that the Board did not have the FDNS memo and needed other "documentary evidence." *See* A.R. 94–95.

The record as designated supplies no explanation for the date of the FDNS memo. Defendants speculate that the July 18, 2017, date may indicate the date on which the memo was printed rather than the date it was prepared. Resp. 10, ECF No. 38. Nothing in the record establishes that proposition, however, and defendants cite nothing allowing the court to so assume. *See id.*

If the date on the FDNS memo indicates its preparation date, then the Director could not have considered it in its May 28, 2013, July 9, 2013, or November 21, 2016, decisions. Yet all three decisions describe the May 2, 2013, investigation, including showing photographs and witness statements, in considerable detail. *See* A.R. 5–8, 13–14. This level of detail, it seems to the court, could not be achieved without consulting investigatory notes.

It is of course possible that no other records documenting the May 2, 2013, investigation exist. The court is not required to indulge such an implausible inference, however. A "court should not overlook plausible, competing inferences that might be drawn from the evidence presented" when deciding whether to allow supplementation or discovery. *Sokaogon Chippewa Cmty. (Mole Lake Band of Lake Superior Chippewa) v. Babbitt*, 961 F. Supp. 1276, 1281 (W.D. Wis. 1997) (citing *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1365 (11th Cir. 1994)). Plaintiffs have made a strong enough showing to justify requiring defendants to explain the date of the FDNS memo, most likely with an appropriate affidavit, and either to introduce evidence that no other investigatory documents exist or to produce such records.[5]

---

[5] Plaintiffs note that the FDNS memo is written using third person language. They take this as an indication that someone other than the original investigators wrote it. If that is so, then whatever materials the writer of the FDNS memo consulted must be added to the administrative record along with any notes of interviews with the investigating officers.

Defendants counter that even if additional investigatory material exists, it was not before the Board on appeal. Indeed, the Board's second decision dated November 22, 2017, acknowledged that it had no interview notes before it. A.R. 11–12. It found that fact unproblematic because the then-appellants did not identify how they were prejudiced. *Id.* According to defendants, this decision is the only one the court may review; right or wrong, the court cannot create a new record here. *See* Resp. 11–13.

Defendants correctly observe (Resp. 12) that judicial review in an APA case is limited to "the full administrative record that was before the [agency adjudicator] at the time he made his decision." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971). But they make too little of the Board's reliance on the Director's November 21, 2016, decision. When the BIA adopts the reasoning of another decisionmaker, a federal court reviews the BIA's decision. *See Estrada v. Holder*, 604 F.3d 402, 406 (7th Cir. 2010) (citing *Khan v. Filip*, 554 F.3d 681, 690 (7th Cir. 2009) (applying rule on petition for review)). Applying a de novo standard of review, the BIA adopted the Director's factual analysis and weighing of the evidence as the basis for its final decision. *See* A.R. 12 ("We acknowledge the voluminous documentary evidence submitted in support of the visa petition, but we agree with the Director that these documents are not persuasive evidence of a shared life together sufficient to overcome the doubts raised by the derogatory information raised in the investigative report."). The record, therefore, must contain all of the material the Director actually considered as well as everything the BIA considered.

In addition to the photographs and possibly notes already discussed, the Director's decisions show on their face that the Director consulted additional material that does not appear to be in the designated administrative record. An insurance claim allegedly sparked the investigation, yet it is not in the record. *See* Notice Intent to Deny, A.R. 313. The FDNS memo

refers to evidence that Bodo and Andreica were out of town on May 2, 2013, but the court knows of no such evidence in this record. *See* A.R. 54. The Director's decision dated November 21, 2016, relies on a purchase agreement for a car showing Bodo and Andreica as co-buyers. *See* A.R. 6. Despite the inferences and speculation about alleged water damage to the document, *see id.*, the document is not in the record. The same decision also counters one of Bodo's arguments this way: "the Director retains material evidence submitted by the beneficiary, that the beneficiary's occupation is that of a cab driver, and has been for some time." A.R. 5. This "material" evidence is not in the record. *Id.* Since the Director's decisions, adopted by the BIA, say that the foregoing evidence was considered, the administrative record is incomplete without it.[6] *See, e.g.*, *Miami Nation of Indians of Ind. v. Babbitt*, 979 F. Supp. 771, 777 (N.D. Ind. 1996).

To sum up, plaintiffs have made the required strong showing that the record is incomplete and that additional information is needed to facilitate meaningful judicial review. The additional information needed includes an explanation of the date appearing on the FDNS memo, A.R. 54–55. To complete the record, defendants must also add any investigative materials, such as notes, photos, an insurance claim, and the purchase agreement, considered by the Director or the BIA. If no such additional materials exist, defendants must supplement the administrative record with an appropriate affidavit so stating and indicating whether any such documents previously existed and, if so, why they cannot be added to the record.

**B. Bad Faith**

The Supreme Court has long recognized that discovery into a decision maker's mental processes is permissible upon a "strong showing of bad faith or improper behavior." *Dep't of*

---

[6] It appears that Bodo did not receive an opportunity to respond to the evidence relied on for the first time in the November 21, 2016, decision. *See* A.R. 5, 6. It is unnecessary today to consider whether Bodo was denied due process.

*Commerce v. New York*, 139 S. Ct. 2551, 2555 (2019) (quoting *Volpe*, *supra*, 401 U.S. at 420). Bad faith must be shown from publicly available records. *Riley*, 82 F.3d at 715. The bad faith exception is rooted in the Due Process Clause. *Air Transp. Ass'n*, *supra*, 663 F.3d at 487. "Decisionmakers violate the Due Process Clause and must be disqualified when they act with an 'unalterably closed mind' and are 'unwilling or unable' to rationally consider arguments." *Id.* (quoting *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1170, 1174 (D.C. Cir. 1979); *see also Riley*, 82 F.3d at 715.

Bodo and Andreica contend that the overall timeline here indicates bad faith or is at least "unusual" enough to justify limited discovery. Mot Limited Disc. 15; *see also id.* at 13–15. Because the court has concluded that supplementation is required on other grounds, the only discovery a finding of bad faith would justify is the depositions of their former neighbors, Irma and Mike (or Ralph) De La Rosa. *See id.* at 15. Plaintiffs believe the De La Rosas are the witnesses who spoke with investigators near 1444 N. Washtenaw on May 2, 2013. *Id.*

The court's review of the record raises serious concerns about the good faith of the underlying investigation and proceedings. The timing of the FDNS memo's introduction into the record (so plaintiffs never could present an argument to the Director about it) makes it appear to have been manufactured for litigation purposes (supplementation will clarify this issue). Documents prepared in anticipation of litigation are generally presumed unreliable. *See, e.g., Palmer v. Hoffman*, 318 U.S. 109, 113 (1943) (stating that extending business records exception in this circumstance would be a "perversion" of the rule); *Stolarczyk ex rel. Estate of Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F. Supp. 2d 834, 841 (N.D. Ill. 2005) (witness had "substantial motivation, with all respect, to embellish" in account prepared for litigation).

14

The manner in which the investigation was conducted raises additional concerns. The FDNS memo states that the investigators had evidence that Bodo and Andreica were out of the country and never explains why the investigators thought they were likely to find Bodo and Andreica at either of the buildings visited. From all that appears from the FDNS memo, the investigators took at face value the statements of the two neighbors with whom they spoke at the 1444 N. Washtenaw building. *See* A.R. 54. The memo does not indicate that they checked the mailboxes or attempted to do so, though it says that the investigators could get close enough to look in the windows. *See id.* In the face of a contrary account from Bodo, the investigators never returned to confirm what the neighbors said, never pulled Cook County property records for the building (Bodo also supplied an appraisal), took no steps to determine if anyone else occupied the building, and never asked basic questions such as how long it had been since the neighbors they interviewed had interacted with Bodo. *See id.*

Perhaps even more befuddling is the dismissive way in which the Director handled much of Bodo's supplemental evidence. In both decisions, the Director described most of the affidavits of friends, family members, and a foreign exchange student as "self-serving" without further discussion. A.R. 3, 313 (citations omitted). One of the two cases on self-serving testimony the Director cited involves discrediting the testimony of an applicant for immigration benefits that is inconsistent with documentary evidence. *See Olowo v. Ashcroft*, 368 F.3d 692, 699 (7th Cir. 2004) (collecting cases) (testimony regarding passport). The other case does nothing to support the Director's decision at all. An immigration judge disregarded a letter from the applicant's brother and a notarized copy of a church document as "self-serving." *Ladha v. I.N.S.,* 215 F.3d 889 (9th Cir. 2000). The Ninth Circuit remanded the case because the fact finder's explanation was insufficient to allow it to review his findings. *See id.* If anything,

15

*Ladha* suggests that the Director's repetition of the "self-serving" mantra is insufficient. In any event, other than Andreica and Bodo's affidavits (not labeled self-serving by the Director), the affidavits of friends and family are not inherently more self-interested than the accounts of investigators. *See Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003) (discussing self-serving affidavits at summary judgment) ("There is nothing inherently more self-serving about Payne's deposition and that of her witness than Pauley's affidavit and those of his police officer witnesses."). What self-serving benefit the tenant at 5616 N. Washtenaw, Unit 105, or a foreign exchange student would obtain from submitting an affidavit is not clear. *See* A.R. 192, 193.

The Director simply does not mention other important evidence or fails to grapple with the most obvious probative aspect of it. For example, the November 21, 2016, decision makes much of the water damage and an agreement to buy a car. *See* A.R. 6. The source of the water is wholly speculative, especially since when and how the Director obtained the document is not stated. *See id.* The Director also fails utterly to grapple with the fact that Bodo and Andreica are co-buyers. *See id.* Bills, tax records, and bank statements are poured over for minute inconsistencies in how the address is written, but the bigger picture these documents appear to paint of a joint household is neither appreciated nor discussed. *See* A.R. 5–6, 153–54.

Despite the many problems on the face of this record, the court need not decide whether these threads together weave a tapestry that justifies discovery. Even if they do, the court cannot see what deposing the De La Rosas would accomplish. *See* Fed. R. Civ. P. 26(c)(1). Plaintiffs do not explain this; they simply state in their opening motion that the depositions would be limited to two hours and would cost defendants very little. Mot Limited Disc. 4–15. More than six years have elapsed since May 2, 2013, and the chances that either witness will remember anything of use at this point strikes this court as exceedingly remote. More importantly,

16

plaintiffs do not explain how their depositions would facilitate APA review. By definition, the BIA and the Director could not have considered depositions created in this case, and plaintiffs do not explain how taking them would aid the court in reviewing the BIA's decision. *Foxx*, 815 F.3d at 1081 (party not entitled to extra record discovery because it did not show discovery would yield anything "material"); *Riley,* 82 F.3d at 714–15; *Babbitt*, 979 F. Supp. at 780. The request to depose the De La Rosas is therefore denied.

## IV. Conclusion

For the reasons stated and consistent with this opinion, plaintiffs' motion to take limited discovery and supplement the record is granted in part and denied in part. Defendants are directed to file a statement within seven days after the entry of this opinion proposing a date by which the record will be supplemented and completed as stated herein.

Date:   August 12, 2019                           /s/
                                        Joan B. Gottschall
                                        United States District Judge